ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 16, 2024

Case No. 24-1130
Consolidated With No. 24-1113

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

TIKTOK INC. and BYTEDANCE LTD.

*Petitioners,*

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of
the United States,

*Respondent.*

*(continued on inside cover)*

ON PETITION FOR REVIEW OF THE PROTECTING AMERICANS
FROM FOREIGN ADVERSARY CONTROLLED APPLICATIONS
ACT (H.R. 815)

**REPLY BRIEF OF CREATOR PETITIONERS**

Ambika Kumar
Tim Cunningham
Xiang Li
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
(206) 757-8030
ambikakumar@dwt.com
timcunningham@dwt.com
xiangli@dwt.com

Jeffrey L. Fisher
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, California 94025
(650) 473-2633
jlfisher@omm.com

*(continued on inside cover)*

*Attorneys for Creator Petitioners*

BRIAN FIREBAUGH, CHLOE JOY SEXTON, TALIA CADET, TIMOTHY MARTIN, KIERA SPANN, PAUL TRAN, CHRISTOPHER TOWNSEND, and STEVEN KING,

*Petitioners*,

v.

MERRICK B. GARLAND, in his capacity as United States Attorney General,

*Respondent*.

————

BASED Politics Inc.,

*Petitioner*,

v.

MERRICK B. GARLAND, in his official capacity as Attorney General of the United States,

*Respondent*.

Elizabeth A. McNamara
Chelsea T. Kelly
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 489-8230
lizmcnamara@dwt.com
chelseakelly@dwt.com

James R. Sigel
Adam S. Sieff
DAVIS WRIGHT TREMAINE LLP
50 California Street, Suite 2300
San Francisco, California 94111
(415) 276-6500
jamessigel@dwt.com
adamsieff@dwt.com

Joshua Revesz
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
(202) 383-5261
jrevesz@omm.com

*Attorneys for Creator Petitioners*

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 1

ARGUMENT ....................................................................... 4

    I.    The Act Violates the First Amendment. .................................. 4

        A.    The Act Impairs Petitioners' Ability to Speak, Associate, and Listen. ..................................................... 4

        B.    The Act Is Subject to the Most Demanding Scrutiny. ..................................................................... 11

            1.    Four features of the Act independently subject it to heightened scrutiny. ....................... 11

            2.    The Act is not a mere time, place, and manner restriction. ............................................ 20

        C.    The Act Fails Any Applicable Level of Scrutiny. ........ 20

            1.    Preventing potential "content manipulation" does not justify the Act. .................................... 21

            2.    The government's claims about data security do not justify the Act. ........................................ 27

        D.    The Act Is Facially Overbroad. .................................... 30

    II.    The Court Should Permanently Enjoin the Act. ................... 32

CONCLUSION ................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ................................................................. 7

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
591 U.S. 430 (2020) ................................................................. 7

*Alario v. Knudsen*,
-- F. Supp. 3d. --, 2023 WL 8270811 (D. Mont. Nov. 30, 2023) .......... 13

*Arcara v. Cloud Books, Inc.*,
478 U.S. 697 (1986) ................................................................. 5

*Ark. Writers' Project, Inc. v. Ragland*,
481 U.S. 221 (1987) ................................................................. 18

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ................................................................. 12

*Barr v. Am. Ass'n of Political Consultants, Inc.*,
591 U.S. 610 (2020) ................................................................. 19

*Bose Corp. v. Consumers Union*,
466 U.S. 485 (1984) ................................................................. 33

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ............................................................. 20, 25

*City of Ladue v. Gilleo*,
512 U.S. 43 (1994) ............................................................. 13, 19

*Clark v. Cmty. for Creative Non-Violence*,
468 U.S. 288 (1984) ................................................................. 20

*FEC v. Cruz*,
  596 U.S. 289 (2022) ............................................................................... 21

*First Nat'l Bank of Bos. v. Bellotti*,
  435 U.S. 765 (1978) ......................................................................... 3, 15

*Freedman v. Maryland*,
  380 U.S. 51 (1965) ................................................................................ 29

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) ................................................................................ 4

*Gordon v. Holder*,
  721 F.3d 638 (D.C. Cir. 2013) ............................................................. 32

*Greater New Orleans Broad. Ass'n v. United States*,
  527 U.S. 173 (1999) .............................................................................. 25

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ........................................................ 23, 28, 29, 31, 32

*Joseph Burstyn, Inc. v. Wilson*,
  343 U.S. 495 (1952) .............................................................................. 26

*Klein v. Facebook, Inc.*,
  580 F. Supp. 3d 743 (N.D. Cal. 2022) ................................................. 14

*Lamont v. Postmaster Gen.*,
  381 U.S. 301 (1965) ........................................................... 9, 15, 22, 23

*Matal v. Tam*,
  582 U.S. 218 (2017) .............................................................................. 16

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*,
  460 U.S. 575 (1983) ........................................................................ 17, 18

*Moody v. NetChoice, LLC*,
  144 S. Ct. 2383 (2024) ................... 1, 6, 8, 18, 21, 22, 23, 26, 30, 31, 33

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
  429 U.S. 274 (1977)....................................................................27

*Murthy v. Missouri*,
  144 S. Ct. 1972 (2024)................................................................10

*N.Y. Times Co. v. United States*,
  403 U.S. 713 (1971)................................................................3, 28

*Near v. Minnesota*,
  283 U.S. 697 (1931)..............................................................12, 14

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015)..............................................................17, 19

*Reno v. ACLU*,
  521 U.S. 844 (1997)................................................................8, 26

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
  487 U.S. 781 (1988)....................................................................27

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
  515 U.S. 819 (1995)....................................................................15

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*,
  547 U.S. 47 (2006)....................................................................6, 7

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011)............................................................5, 6, 27

*Thomas v. Chi. Park Dist.*,
  534 U.S. 316 (2002)....................................................................12

*Trump v. Hawaii*,
  585 U.S. 667 (2018)................................................................9, 10

*United States v. O'Brien*,
  391 U.S. 367 (1968)......................................................................6

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000)................................................................30

*United States v. Robel*,
    389 U.S. 258 (1967)................................................................24

*Va. Pharmacy Bd. v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976)................................................................11

*Vance v. Universal Amusement Co.*,
    445 U.S. 308 (1980)................................................................13

*Virginia v. Hicks*,
    539 U.S. 113 (2003)..................................................................5

*Whitney v. California*,
    274 U.S. 357 (1927)..................................................................3

*Williams-Yulee v. Fla. Bar*,
    575 U.S. 433 (2015)................................................................25

*Zauderer v. Office of Disciplinary Counsel*,
    471 U.S. 626 (1985)................................................................30

## Constitutional Provisions

U.S. Const. amend I ...........................................................1-33

## Federal Statutes

Protecting Americans from Foreign Adversary Controlled
    Applications Act, Pub. L. No. 118-50, Div. H, 138 Stat. 895, 955-60
    (Apr. 24, 2024)...................................................................1-34

## Other Authorities

Alden Fletcher, *Foreign Election Interference in the Founding Era*,
    Lawfare (Oct. 25, 2018) ......................................................23

Ken Bensinger, *Harris Joins TikTok, Another Sign of the App's Value in Reaching Young Voters*, N.Y. Times (July 26, 2024) ........24

Kevin Hurler, *What Is 'SwiftTok'?*, Gizmodo (Oct. 17, 2022)................31

Letter from Thomas Jefferson to Thomas Paine (June 19, 1792)...........3

Michael Gold, *Trump Joins TikTok, the App He Once Tried to Ban*, N.Y. Times (June 2, 2024) ................................................................24

Philip C. Kissam, *Alexis de Tocqueville and American Constitutional Law*, 59 Maine L. Rev. 36 (2007) ................................7

## INTRODUCTION AND SUMMARY OF ARGUMENT

"Whatever the challenges of applying the Constitution to ever-advancing technology, the basic principles of the First Amendment do not vary." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2403 (2024) (citation and internal quotation marks omitted). Those time-honored principles give U.S. residents the right to express themselves in this country; associate for purposes of doing so with editors and publishers of their choice; and receive communication from others, including entities anywhere in the world. Petitioners therefore have the right to speak, associate, and listen on TikTok—regardless of the social media platform's ownership structure. And the Act's impingement upon those activities is subject to the most demanding scrutiny.

The government responds that TikTok must be banned because its content could be "manipulated" to "interfere with our political system and political discourse, including our elections." Government Br. (GB) 35–36. One need not wade through the government's filings, however, or even review the classified material it proffers, to see the hollowness of this contention. The day before the government submitted its brief, the Vice President of the United States—presumably fully aware of all relevant

1

information—joined TikTok to promote her presidential campaign, implicitly encouraging millions of Americans to use the platform to engage in political and electoral discourse. What's more, the Act allows TikTok to operate throughout the 2024 election cycle and subsequent presidential transition—a period in which the President maintains our very democracy is at stake. Given those realities, it simply cannot be that TikTok presents a "grave threat to national security." *Id.*

Even taking the government's brief at face value, its plea for banning the platform is unconvincing. The government's concerns regarding data collection ignore basic facts and could be easily met with less drastic alternatives. The government's content-manipulation argument reflects worries that, in the ongoing "geopolitical competition" between the United States and China, GB 20, the platform could provide China a powerful tool (at some unspecified point in the future, apparently after the 2024 election) to influence people's views. In other words, the government worries that the pen—or, more precisely, a modern printing press—could be mightier than the sword. But that potential has been recognized for centuries. The Founders were keenly alert to it as well. Writing to Thomas Paine in 1792, Thomas Jefferson urged him to "[g]o

2

on then in doing with your pen what in other times was done with the sword: shew that reformation is more practicable by operating on the mind than on the body of man." Letter from Thomas Jefferson to Thomas Paine (June 19, 1792).

But instead of reacting to the potential power of speech—from internal revolutionaries, international agitators, or anyone in between—with censorship, the First Amendment charts a different path. It ensures that "the people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments[,]" even (or especially) about politics. *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 791 (1978). As Justice Brandeis explained in response to the first Red Scare, "no danger flowing from speech" justifies its suppression "unless the incidence of the evil apprehended is so imminent that it may befall before there is opportunity for full discussion." *Whitney v. California*, 274 U.S. 357, 377 (1927) (concurring opinion); *see N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) ("*Pentagon Papers*"). "[T]he remedy to be applied" to political speech, in short, "is more speech, not enforced silence." *Whitney*, 274 U.S. at 377 (Brandeis, J., concurring);

3

accord *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40 (1974). The Court should follow that tradition here.

## ARGUMENT

### I.    The Act Violates the First Amendment.

#### A.    The Act Impairs Petitioners' Ability to Speak, Associate, and Listen.

The government is strikingly blasé about the effect of banning TikTok on Petitioners' First Amendment rights. Never mind, it says, that Petitioners—like millions of other Americans—have found themselves distinctively able to communicate and obtain information on TikTok. "TikTok users," the government suggests, "have the option of turning to other platforms." GB 60. That statement fails to reckon with the many unrebutted ways shutting down TikTok would stymie Petitioners' ability to speak, associate, and listen, notwithstanding the existence of "other platforms." And nothing about the Act's divestiture provision lessens the threat to those First Amendment rights.

**1. Speaking.** Petitioners' opening brief explains how enforcing the Act would prevent them from speaking on the forum and medium of TikTok. Opening Br. (OB) 24–30. The government responds that the Act

4

does not "target" any such First Amendment activity, or at most places "burdens on petitioners' speech [that] are purely incidental." GB 60–62. The government is wrong. The First Amendment does not apply to laws "of general applicability" that regulate only non-expressive conduct (like prostitution that happens to take place at a bookstore), and do not "ha[ve] the inevitable effect of singling out those engaged in expressive activity." *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 705, 707 (1986) (nuisance law); *accord Virginia v. Hicks*, 539 U.S. 113, 123–24 (2003) (trespass). Where, by contrast, a law is "directed at" speech or speakers, either "on its face" or "in its practical operation," it regulates speech. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).

The Act is aimed directly at speech. It regulates social media platforms that allow users to "generate, share, and view text, images, video, real-time communications, or similar content." Act § 2(g)(2)(A)(i). It also targets TikTok specifically, as well as any other platform that "has more than 1,000,000 monthly active users" (unless the company that owns the platform operates an application "whose primary purpose is to allow users to post product reviews, business reviews, or travel

5

information and reviews"). *Id.* §§ 2(g)(2)(A)(ii) & 2(g)(2)(B); (3)(A). The Act, therefore, does not regulate only non-expressive conduct.

Nor, for essentially the same reasons, does the Act impose a merely "incidental effect" on Petitioners' speech. GB 61 (citing *United States v. O'Brien*, 391 U.S. 367, 377 (1968)). Both "on its face and in its practical operation," the Act restricts Petitioners' speech on social media. *Sorrell*, 564 U.S. at 567. That direct burden demands searching First Amendment scrutiny.

**2. Associating**. The Act also impairs Petitioners' First Amendment right to associate with TikTok as their preferred publisher and editor. *See* OB 30–33. "Like the editors" of books and magazines, "the major social-media platforms are in the business ... of combining 'multifarious voices' to create a distinctive expressive offering." *NetChoice*, 144 S. Ct. at 2405 (citation omitted). TikTok is no different, which is why Petitioners have a "right to associate" with TikTok as their editor and publisher to project their voices. *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 68 (2006) (*FAIR*).

The government's only real answer is to suggest that Petitioners have no right to post on TikTok because its ultimate parent company is

6

a foreign entity. GB 78. But nothing about TikTok's ownership structure deprives it—an American company—of First Amendment rights. TikTok Reply 6–7. At any rate, this particular Petition concerns *Petitioners'* "ability to express [their] message" in America, *see FAIR*, 547 U.S. at 69, not any attempt to "export" their First Amendment rights abroad, *see* GB 78 (quoting *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 437–38 (2020)). And when people in America exercise their own right to speak, the First Amendment protects their right to affiliate with domestic or foreign entities to do so effectively. *See Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 219 (2013).

Any other rule would be startling. Under the government's view, Congress could have banned publication of *Democracy in America* because early Americans shared their insights through the voice of a French author sent here in 1831 by the French government. *See* Philip C. Kissam, *Alexis de Tocqueville and American Constitutional Law*, 59 Maine L. Rev. 36, 42 (2007). Today, Congress could ban American musicians from posting on (Swedish-based) Spotify or (German-based) SoundCloud; American writers from placing stories on *Al Jazeera*; American actors from appearing in movies directed by Oscar-winning

Iranian director and producer Asghar Farhadi; and American academics from publishing in the Oxford University Press. The government offers no basis in history, tradition, or precedent to adopt such an extreme and far-reaching limitation on free association and expression.

The most the government does is assert in its statement of the case that the Act "echoes approaches previously taken by Congress" to regulate foreign ownership in other sectors of our economy. GB 13. But the Government advances no legal argument based on those other statutes. For good reason: Most of those other statutes concern commercial entities that neither engage in nor host expression (such as "nuclear facilit[ies]"). *Id.* (citation omitted). One statute involves radio licenses, but it is well-established that different First Amendment considerations apply to "channel space" on a broadcast spectrum. *NetChoice*, 144 S. Ct. at 2408 n.10; *see also Reno v. ACLU*, 521 U.S. 844, 868–70 (1997) (explaining why "special justifications for regulation of the broadcast media" do not extend to the "vast democratic forums of the Internet").

3. **Listening.** The Act also impairs Petitioners' First Amendment right to receive information and ideas, including news. That conclusion

8

follows a fortiori from *Lamont v. Postmaster General*, 381 U.S. 301 (1965), which held that U.S. citizens had a First Amendment right to receive content labeled "communist political propaganda" from "foreign countries." *Id.* at 302–03. Here, the Act bans all content on TikTok, simply because the government fears it might be used to spread propaganda.

The government's effort to distinguish *Lamont* is hard to understand. It argues that the Act is unlike the law the Court invalidated there because the Act allows foreign entities to express their views "in any forum other" than TikTok. GB 78. But the law invalidated in *Lamont* also left open other channels of communication; it regulated only the U.S. mail—not radio, television, or even pamphleteering. What matters, therefore, is not whether listeners might somehow be able to obtain information on TikTok from another source; the key is whether Americans have a right to use a domestic medium for speech to receive even foreign propaganda. They most certainly do.

The government's "cf." citation to *Trump v. Hawaii*, 585 U.S. 667 (2018), changes nothing. GB 79. The sentence the government selectively quotes begins with the phrase "[g]iven the authority of the political

branches over admission." *Trump*, 585 U.S. at 703. This confirms the Court's analysis was confined to the special context of noncitizens seeking physically to enter into this country, where ordinary First Amendment rules are "circumscribed." *Id.*[1]

**4. Divestiture.** The government finally seeks to avoid First Amendment scrutiny on the ground that the Act addresses "control of TikTok, not the content on the platform." GB 60. But those two things are inseparable. For one thing, the government does not really dispute TikTok's showing that divestiture is practically impossible. *See* TikTok Reply 6.

But even if it were possible, the First Amendment still gives Petitioners the right to engage with the publisher of their choice. Thus, when the government forces speakers to work with different editors and publishers (because of changes in ownership structure or otherwise), or forces listeners to get their "news" or other information from a different

---

[1] *Murthy v. Missouri*, 144 S. Ct. 1972 (2024), is even further afield. *See* GB 78. That decision established no First Amendment law whatsoever. In any event, the Court held that social media consumers failed to allege an Article III injury-in-fact because they did "not point to any specific instance of content moderation that caused them identifiable harm." *Murthy*, 144 S. Ct. at 1996. Here, the Act would deprive Petitioners of access to *all* content on TikTok.

source, GB 18, the First Amendment is inescapably implicated. *See, e.g.*, *Va. Pharmacy Bd. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 & n.15 (1976) (summarizing case law); OB 35–37.

Any divestiture of TikTok would, by virtual necessity, change the content and editorial practices on the platform in fundamental ways. *See* OB 12–13 (noting deterioration of Petitioners' experience on X after ownership change); *see also Amicus* Br. of First Amendment Professors 7–8 (divestiture requirement would "permit the federal government to select buyers who will be sympathetic to and permit the publication of the government's viewpoints").

### B.  The Act Is Subject to the Most Demanding Scrutiny.

#### 1.  Four features of the Act independently subject it to heightened scrutiny.

Government actions abridging First Amendment rights warrant the most demanding review—strict scrutiny, or something even greater—if they: (1) impose a prior restraint on speech; (2) foreclose a medium of communication; (3) target speech based on its viewpoint; or (4) discriminate based on the content of speech. The Act does all four.

**a. The Act imposes a prior restraint.** The Act is a prior restraint because it "suppress[es] the future publication" of Petitioners' speech on

11

TikTok without any prior determination that it poses a threat. *Near v. Minnesota*, 283 U.S. 697, 709 (1931); see OB 38–40.

The government responds that the "Act does not contemplate an injunction against speech like the provision invalidated in *Near*." GB 79. But that is immaterial. The prior-restraint doctrine requires "look[ing] through forms to the substance" of a regulation. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). And "the threat of invoking legal sanctions" after the fact creates a prior restraint when it prevents publication. *Id.* That is what the Act does. It singles out speech on TikTok for extinction, without affording TikTok or its users any opportunity to show that the platform meets the Act's substantive test that applies to all other social media applications—namely, that it does not "present a significant threat to the national security of the United States." Act § 2(g)(3)(B)(ii).

The government also implies that prior-restraint doctrine applies only where there is "the specter that officials will exercise 'unconfined authority to pass judgment on the content of speech' as a means of stifling disfavored speech or speakers." GB 79 (quoting *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 320 (2002)). That is incorrect. A prior restraint also

12

arises where, as here, a statute bans speech without any legislative determination that it is substantively unlawful. *See Vance v. Universal Amusement Co.*, 445 U.S. 308, 311, 316–17 (1980) (per curiam) (invalidating law banning theaters from displaying movies that had not been previously determined to be obscene).

**b. The Act forecloses a distinct medium for speech.** The government does not contest that a speech restriction triggers strict scrutiny if it forecloses a medium or forum for expression. *See* OB 43–44; *City of Ladue v. Gilleo*, 512 U.S. 43, 54 (1994). Instead, the government suggests that principle is inapplicable here because platforms besides TikTok provide comparable "venues for short-form videos." GB 63.

Those platforms, however, lack TikTok's "distinct culture"; TikTok's "genuine and supportive" communities; TikTok's innovative editing tools; TikTok's "natural and intuitive" experience; and TikTok's distinct recommendation system. OB 24–30. That is precisely why the only court to consider the argument the government makes here held there is "no support for the conclusion that [creators] may simply substitute another social media site in place of TikTok and achieve the same effect." *Alario v. Knudsen*, -- F. Supp. 3d. --, 2023 WL 8270811, at

*8 (D. Mont. Nov. 30, 2023); *see Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 769 (N.D. Cal. 2022) (similar).

Lest there be any doubt, TikTok creators have attested to TikTok's distinctiveness. *See, e.g.*, Cadet Decl. ¶ 13, Add. 15 ("[T]he nature of my expression is different on TikTok than it is on other apps."); Townsend Decl. ¶ 6, Add. 65 ("There are also types of content ... that are specific to the TikTok culture."). The Court should therefore hold, based on the uncontradicted evidence, that banning TikTok forecloses access to a unique expressive medium.

Even if TikTok could fairly be characterized as just one of many social media platforms that operate roughly the same way (and it cannot), the government's First Amendment argument still cannot possibly be right. The argument is no different from saying that a law prohibiting American journalists from publishing in *The Economist* absent a divestiture of ownership would not trigger heightened scrutiny because there are other magazines that publish similar articles. Every distinct publication is its own forum, so any law targeting a distinct social media site triggers strict scrutiny. *See, e.g., Near*, 283 U.S. at 713 (law

14

permitting injunction against a single newspaper was "the essence of censorship"). That principle applies here.

**c. The Act discriminates based on viewpoint.** In response to Petitioners' claim that the Act discriminates based on viewpoint, the government doubles down on its purported concern that allowing TikTok to operate "could" allow Chinese agents to "manipulat[e] this country's public discourse"; "amplify[] preexisting social divisions"; or even curate content to "advance [China's] own interests." GB 38, 44, 67.

These proffered justifications are overtly viewpoint-discriminatory. A law regulating speech discriminates based on viewpoint "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). That is true regardless of whether the perspective the statute aims to squelch might be "divisi[ve]" or "in direct contravention of U.S. interests." GB 44, 67. If anything, such a rationale—whether proffered during the Red Scare, the Cold War, or today—only confirms the viewpoint-based aims of the statute. *See, e.g.*, *Bellotti*, 435 U.S. at 791 & n.31 (discussing cases decided during Red Scare); *Lamont*, 381 U.S. at 307 (regulation of speech because it

15

purportedly contained "the seeds of treason" during Cold War was "at war with" the First Amendment's commitment to uninhibited discussion of ideas); *Matal v. Tam*, 582 U.S. 218, 247 (2017) (plurality opinion) ("[F]ree speech would be endangered" if the courts "permit[] the suppression of any speech that may lead to political or social 'volatility.'"). In this respect, the government's brief parallels the legislative record, where numerous Congress members supported the Act because videos on TikTok allegedly "manipulate[] the minds of Americans," "undermine our love for liberty," and so on. OB 46–47. The government attempts to distance itself from these statements, asking the Court to instead focus on "the actual concern about manipulation of the platform (including its content)." GB 70. But the government never explains how this "concern" is any different from legislative "concerns about the platform's content." *Id.* In either case, the fundamental point remains the same: The government wishes to shutter TikTok—as the Act's proponents said at the time—because it does not like views that "could" be expressed there. Regardless of whether that concern has any basis in reality, it warrants the most demanding First Amendment review.

16

**d. The Act is content-based.** For similar reasons, the Act discriminates based on the content of speech. The Act singles out TikTok, distinguishing between content on that platform and content elsewhere. *See* OB 43–44.  Indeed, the very premise of the government's defense is that "content" on TikTok is—or, more accurately, in the future could be—problematic. *E.g.*, GB 2, 8, 15, 16, 35–39.

More broadly, the Act targets social media communication while excluding from its reach services that host other forms of speech. OB 44–46. Indeed, the government recognizes that the Act applies only to "platforms where users engage by sharing 'text, images, videos, real-time communications, or similar *content*' for consumption by other users." GB 68 (emphasis added) (quoting Act § 2(g)(2)(A)(i)); *see id.* (arguing that the Act "recognizes particular susceptibilities from the manner that users interact and engage with social-media platforms"). The Act therefore "singles out specific subject matter" "for differential treatment." *Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015).

The government offers little response to Petitioners' authority on this point. *See* OB 43–44. The Supreme Court in *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575 (1983),

17

for example, held that a law triggered strict scrutiny where it imposed "differential treatment" on the press than on non-press entities. *Id.* at 585; *see also Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 229–30 (1987) (similar). Substitute "social media companies" for "the press," and this case is the same. *Cf. NetChoice*, 144 S. Ct. at 2393. ("[W]hile much about social media is new, the essence of that project is something this Court has seen before."). The government responds to none of these cases.

Instead, the government tries to justify the portion of the statute that exempts "an entity that operates a website [or application] whose primary purpose is to allow users to post product reviews, business reviews, or travel information and reviews." Act § 2(g)(2)(B). The government insists this language should be understood to provide that "review applications cannot serve as qualifying applications that subject a company to the Act's strictures," GB 69—and not, as Petitioners had asserted, OB 16, and the text of the statute makes clear, "allowing otherwise-covered companies to escape regulation merely by also creating a review application," GB 69. But even if the Government's reading were plausible (and it is not, *see* TikTok Reply 27), the government's interpretation would not render the Act content-neutral:

18

Either way, whether the Act applies "depend[s] entirely on the communicative content" an application provides. *Reed*, 576 U.S. at 164; *see also Barr v. Am. Ass'n of Political Consultants, Inc.*, 591 U.S. 610, 636 (2020) (plurality opinion).

The government's fallback argument—that the review exception could be severed from the statute—fares no better. *See* GB 69. Severance would be ineffectual here because the exception fatally "diminish[es] the credibility of the government's rationale for restricting speech in the first place." *Barr*, 591 U.S. at 622 (plurality opinion) (quoting *City of Ladue*, 512 U.S. at 52); *see* TikTok Reply 28–29. That is, even if the exception were severed, the law would remain content-based (and thus subject to strict scrutiny) because Congress targeted a distinct medium based on its content and concerns about viewpoints that might be expressed or amplified on the platform. *See supra* 13–16. This is therefore not a case where removing a content-based exception to an otherwise "generally applicable" regulation eliminates a law's constitutional infirmity. *Compare Barr*, 591 U.S. at 633–34 (plurality opinion).

19

2. **The Act is not a mere time, place, and manner restriction.**

For all these reasons, the government cannot classify the Act as a mere "time, place, and manner regulation[]." GB 63. That doctrine covers laws that are justified "without reference to the content of the regulated speech." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). But the Act here targets a specific publisher that provides a unique forum and medium for communication, for reasons bound up in the speech the platform hosts and prioritizes (or "could" prioritize). *See supra* at 13–19. And it affects not only the time, place, or manner in which Petitioners wish to speak, but their decision to work with their editor and publisher of choice. *See supra* at 6–8.

C. **The Act Fails Any Applicable Level of Scrutiny.**

Under strict scrutiny, the government must show the Act "is justified by a compelling government interest and is narrowly drawn to serve that interest." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011). The government has not made this showing—or even a showing that would satisfy intermediate scrutiny.

20

### 1. Preventing potential "content manipulation" does not justify the Act.

The government claims the Act is necessary to prevent Chinese officials from someday covertly shaping the presentation of content with political implications that "could" appear in U.S. users' feeds. GB 35. Speculation about "anticipated harm[s]" is insufficient "to carry a First Amendment burden." *FEC v. Cruz*, 596 U.S. 289, 307 (2022) (citation and internal quotation marks omitted). But even if the government had evidence substantiating its claim, the argument would fail.

**a. This is not a compelling interest.** *NetChoice* takes the government's content-manipulation argument off the table. There, the Supreme Court held that a concern that social media content is manipulated to disfavor "conservative viewpoints and ideas" is not a "valid, let alone substantial" First Amendment interest. 144 S. Ct. at 2407. "[C]orrect[ing] the mix of speech" that a social media platform presents to users, the Court reasoned, is "related to the suppression of free expression" and thus an impermissible basis to uphold a statute regulating such platforms. *Id.* That holding forecloses the government's plea to ban TikTok because the platform *might* be used to "influence"

what users think about political issues or "exacerbate[s] social divisions" in our country. GB 35.

The government responds that TikTok's ties to foreign entities mean the platform's content curation is more likely to "undercut U.S. national-security interests." GB 74. But the First Amendment prohibits the government from "control[ling] the flow of ideas to the public," even from abroad. *Lamont*, 381 U.S. at 306–07. In any event, much of the speech the government seeks to suppress—including Petitioners'—is U.S.-based. The asserted involvement of a foreign entity in its publication (merely by means of corporate structure) does not empower the government to squelch it. *See supra* at 7–9.

It does not matter that any supposed Chinese influence on TikTok's publication practices could be "covert." GB 58. Every social media platform runs on algorithms (and the human editorial choices they embody) that are not shared with the public. Yet *NetChoice* holds that the First Amendment forbids regulatory intrusion on such editorial decisions. 144 S. Ct. at 2405–06. Indeed, editorial influence has always been largely invisible to consumers of books, television, and other media. And publishers also regularly accommodate various types of

22

surreptitious interests——for instance, family or friends of those discussed in a book, or corporate entities seeking to avoid negative news coverage. Yet nothing about the "covert" nature of such intermeddling gives the government the right to regulate the expressive content that is ultimately disseminated.

Nor does wrapping this censorship interest in the mantle of "national security" change anything. *E.g.*, GB 44, 70. The Supreme Court's "precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010). A speech-suppressive interest cannot satisfy any level of First Amendment scrutiny, *NetChoice*, 144 S. Ct. at 2407, regardless of the government's national-security gloss. *See Lamont*, 381 U.S. at 302–03. Indeed the government's concern is nothing new. For as long as we have been a republic, foreign nations have sought to influence our affairs. *See* Alden Fletcher, *Foreign Election Interference in the Founding Era*, Lawfare (Oct. 25, 2018), https://tinyurl.com/2s3cmcwf. But the "risks of internal subversion" inherent in a free society have never licensed the government to subvert the liberties that "make[] defense of the Nation

worthwhile." *United States v. Robel*, 389 U.S. 258, 264 (1967). The government provides no historical support for the idea that it may silence U.S. residents like Petitioners, regardless of whether they associate with editors or publishers with foreign ties.

**b. The Act is not narrowly tailored to serve this interest.** Even if the government's content-manipulation interest were valid, the Act would not be tailored to that goal.

To begin, the government's content-manipulation interest is incompatible with the fact that the Act permits TikTok to operate through the 2024 election. Act § 2(a)(2)(A). The President has declared that this election will determine "[w]hether democracy is still America's sacred cause." Add. 408; *see* OB 41. Yet Congress and the President are allowing TikTok to remain fully operational through the election and for months afterwards. Federal candidates of all stripes—including those currently or previously central to our national security—are using the platform and implicitly encouraging Americans to do the same.[2] The

---

[2] *See* Ken Bensinger, *Harris Joins TikTok, Another Sign of the App's Value in Reaching Young Voters*, N.Y. Times (July 26, 2024), https://tinyurl.com/muc7hncy; Michael Gold, *Trump Joins TikTok, the App He Once Tried to Ban*, N.Y. Times (June 2, 2024), https://tinyurl.com/2mfa7p3d.

government offers no explanation for how these realities could possibly comport with any purported need to fend off content manipulation.

Other aspects of the Act's underinclusiveness confirm its lack of narrow tailoring. It is of course true that the government "need not address all aspects of a problem in one fell swoop." GB 73 (quoting *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015)). But a statute that "fail[s] to regulate vast swaths of conduct that similarly diminish[] its asserted interests" cannot satisfy strict scrutiny. *Williams-Yulee*, 575 U.S. at 448. And here, the government concedes, GB 78, the Act does nothing to prevent the Chinese government from amplifying subversive information on other social media platforms. The Act does not even cover traditional media, published in English and distributed across the United States, like the state-owned *China Daily*. The failure to account for this underinclusivity—or justify the Act's puzzling framework of irrational exceptions, *see* OB 52–53—is "alone enough" to fail strict (or even intermediate) scrutiny. *Brown*, 564 U.S. at 802; *see also Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 193 (1999).

The government also fails to show that the traditional remedy to speech-based harms—counterspeech—is insufficient to address the

supposed ills it fears. *See* OB 54. The government seems worried that the possibilities for influencing hearts and minds are greater on social media than with respect to past forms of communication. But "even as one communications method has given way to another," the courts' "settled principles about freedom of expression" have never wavered. *NetChoice*, 144 S. Ct. at 2403. That is why the Supreme Court rejected the government's argument that special First Amendment rules were necessary to ensure the proper development of the internet, holding that the "interest in encouraging freedom of expression in a democratic society outweighs any theoretical but unproven benefit of censorship." *Reno*, 521 U.S. at 885. And it is why, four decades earlier, the Court declined to credit the government's claim that "motion pictures possess a greater capacity for evil ... than other modes of expression," concluding that movies' supposed "capacity for evil ... does not authorize substantially unbridled censorship." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502 (1952). The same reasoning holds true here.[3]

---

[3] If intermediate scrutiny that governs time, place, and manner restrictions were to apply here, the Act would still be invalid for the same reasons just set forth, and because the Act fails to leave content creators and users alternative means of communication. *See* OB 48; *supra* at 13–14.

### 2. The government's claims about data security do not justify the Act.

The government alternatively claims the Act advances an interest in protecting U.S. users' "personal information," including their contacts lists and "physical locations," from the Chinese government. GB 28–29, 34, 53–54. This interest would have to be particularly powerful to save the Act: Because the government's content-manipulation justification is impermissible, the government's data-security justification cannot save the Act unless it is clear that Congress "would have reached the same decision" in enacting the Act "in the absence" of the improper rationale. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). The government comes nowhere close to making that showing.

**a. This is not a compelling interest.** The government's first problem is that disclosing personal information to TikTok (or any other mobile application) is an individual choice that the First Amendment protects. The "dissemination of information" is "speech within the meaning of the First Amendment," *Sorrell*, 564 U.S. at 570, and the government "may not substitute its judgment as to how best to speak for that of speakers," *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 790–91 (1988).

So to the extent Americans choose to share information with TikTok, the government has no legitimate interest prohibiting that choice.

The government also fails to show that its data security concerns are "direct, immediate, and irreparable"—the standard required to suppress speech on national-security grounds. *Pentagon Papers*, 403 U.S. at 730 (Stewart, J., concurring); *id.* at 726–27 (Brennan, J., concurring) (same). Quite the opposite: the government's declarant admits that it has "no information" that the Chinese government has accessed American TikTok users' data or intends to imminently. Blackburn Decl. ¶¶ 9, 51, Gov't App. 4, 16.

That leaves the government to assert only that Chinese agents "may" access the data. GB 24, 26–27. That appears doubtful in light of the extensive measures TikTok has taken to prevent this possibility. *See* TikTok Br. 15-17. At any rate, even *Humanitarian Law Project* demanded more certainty than the government offers here. While the Court there recognized the government's leeway to "confront evolving threats in an area where information can be difficult to obtain," 561 U.S. at 34, it still required the government to show it was "seeking to prevent *imminent* harms in the context of international affairs and national

security," *id.* at 35 (emphasis added). At least in its public briefing, the government has not satisfied this standard.

Of course, the government redacts large portions of its briefing that it intends to prevent Petitioners—and the public—from seeing. But that decision only compounds the First Amendment problem. The government cannot silence 170 million people without some form of adversarial testing that allows those affected to answer the government's reasons for censoring their speech. *See Freedman v. Maryland*, 380 U.S. 51, 58–60 (1965). That concern is particularly acute when the government's declarations appear to rest on inaccuracies about TikTok's data-collection practices. *See* TikTok Reply 25 (noting that TikTok no longer collects location data).

**b. The Act is not narrowly tailored to serve this interest.** There are also less restrictive alternatives to responding to data privacy concerns than shutting down TikTok.

First, and most obviously, the government could simply ban TikTok from collecting the two forms of data—location and contact data—about which the government complains. *See* GB 34. Alternatively, the government could take any number of lesser steps. *See* OB 57–58 (listing

less restrictive alternatives). It could advise users not to share their data with TikTok. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 823–24 (2000) (informing consumers about their options to avert the harms Congress purports to address provides a less restrictive alternative to censorship). It could encourage (or potentially compel) mobile phone and browser operators to remind users about the risk of sharing sensitive data. Or it could require TikTok itself to provide "factual and uncontroversial information" to its users about data-security risks. *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985). What it cannot do is to ban TikTok entirely.

Again, the government's own conduct confirms that any data-security risks to TikTok can be addressed while still permitting speech on the platform. If the Vice President of the United States can create and post on a personal TikTok account, *see supra* at 1–2, then presumably ordinary Americans can toggle their security settings to use TikTok without personal risk (or risk to the country at large).

## D.    The Act Is Facially Overbroad.

*NetChoice* confirms that a law regulating social media is overbroad and facially invalid under the First Amendment if it "prohibits a

30

substantial amount of protected speech relative to its plainly legitimate sweep." 144 S. Ct. at 2397 (citation and internal quotation marks omitted); *accord* OB 60. And the government acknowledges the Act sweeps absolutely. *See* GB 74–75. But it contends that sweep is legitimate because the TikTok "platform itself, as a whole ... creates unacceptable national-security risk." GB 75.

The vast majority of speech on TikTok, however, has nothing to do with politics, much less elections. Teenagers riffing off Taylor Swift songs, for example, are not engaging in political speech. *See* Kevin Hurler, *What Is 'SwiftTok'?*, Gizmodo (Oct. 17, 2022), https://tinyurl.com/2naz2s47. And Petitioners use the platform to speak on topics including ranching, sports, and religion. OB 5–6. They also use ByteDance-provided editing tools, like CapCut, that do not present a risk of content manipulation. *See* OB 54. Yet the government never explains why it is necessary to ban all ByteDance-owned platforms to avoid alleged covert manipulation of a small slice of content on TikTok that could have political ramifications. Even in *Humanitarian Law Project*, the high-water mark for national-security deference, the Court stressed that the statute there restricted "only a narrow category of speech"—

namely, speech providing material support to designated terrorist organizations. 561 U.S. at 26. The Act here, in contrast, bans all speech from U.S.-based creators on TikTok.

Nor does the government ever assert that any location data or other personal information of ordinary Americans might be used for any nefarious purpose—only that certain categories of people like "federal employees" and their "family members" are at risk. GB 58. The government accordingly cannot show that this asserted interest, even if valid as-applied in some situations, supports shutting down TikTok entirely either.

## II.    The Court Should Permanently Enjoin the Act.

If the Court finds that the Act violates the First Amendment, it should enjoin the Act. The government does not dispute that Petitioners will be irreparably harmed if the Act's TikTok ban takes effect. And the government's claims about the "balance of the equities and the public interest," GB 86–87, rise and fall with the merits: When a statute violates the First Amendment, its enforcement "is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

If factual disputes prevent the Court at this stage from determining whether the Act is constitutional, the Court should preliminarily enjoin the Act pending further proceedings. To be sure, the parties agreed to present "factual submissions in connection with [these] legal briefs." GB 87; *see* Joint Motion (May 17, 2024). But if the Court finds a genuine dispute of material fact, the First Amendment requires the Court to resolve that dispute. *See NetChoice*, 144 S. Ct. at 2399 (remanding because "the record is underdeveloped"); *id.* at 2411 (Jackson, J., concurring in part and concurring in the judgment) (similar); *id.* at 2435–36 (Alito, J., concurring in the judgment) (similar); *cf. Bose Corp. v. Consumers Union*, 466 U.S. 485, 503–11 (1984) (definitive record support necessary for any judgment restricting First Amendment freedoms). And in that eventuality, the undisputed irreparable harm a TikTok shutdown would cause Petitioners—coupled with their strong showing on the other factors—would favor a preliminary injunction.

Congress, in fact, has already determined that TikTok may continue operating for many months ahead without unduly impairing any governmental interests. Act § 2(a)(2)(A); *see supra* at 24–25. There is

33

no reason the same would not be true with respect to any additional time necessary to determine whether the Act is constitutional.

## CONCLUSION

The Court should enjoin the Act. Alternatively, it should enter a preliminary injunction and order further proceedings as appropriate.

Dated: August 15, 2024

Respectfully submitted,

*/s/ Ambika Kumar*
Ambika Kumar
Tim Cunningham
Xiang Li
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
(206) 757-8030
ambikakumar@dwt.com
timcunningham@dwt.com
xiangli@dwt.com

Elizabeth A. McNamara
Chelsea T. Kelly
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 489-8230
lizmcnamara@dwt.com
chelseakelly@dwt.com

*Attorneys for Creator Petitioners*

Jeffrey L. Fisher
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, California 94025
(650) 473-2633
jlfisher@omm.com

James R. Sigel
Adam S. Sieff
DAVIS WRIGHT TREMAINE LLP
50 California Street, Suite 2300
San Francisco, California 94111
(415) 276-6500
jamessigel@dwt.com
adamsieff@dwt.com

Joshua Revesz
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
(202) 383-5261
jrevesz@omm.com

34

<u>**CERTIFICATE OF COMPLIANCE**</u>

1.    This document complies with the type-volume limit set by the Court's order of May 28, 2024, because this brief contains 6,475 words, excluding the parts of the brief exempted by Fed. R. App. 32(f).

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-point Century font.

Dated: August 15, 2024            Respectfully submitted,

*/s/ Ambika Kumar*
Ambika Kumar
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
(206) 757-8030
ambikakumar@dwt.com

*Counsel for Creator Petitioners*

35