# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

BRIAN FIREBAUGH, CHLOE JOY
SEXTON, TALIA CADET, TIMOTHY
MARTIN, KIERA SPANN, PAUL
TRAN, CHRISTOPHER TOWNSEND,
and STEVEN KING,

                *Petitioners*,

     v.

MERRICK B. GARLAND, in his
capacity as United States Attorney
General,

                *Respondent*.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 24-1130

## PETITION FOR REVIEW AND COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

# NATURE OF THE ACTION

1.      Petitioners are among the 170 million Americans who create, publish, view, interact with, and share videos on TikTok. They rely on TikTok to express themselves, learn, advocate for causes, share opinions, create communities, and even make a living. Although they come from different places, professions, walks of life, and political persuasions, they are united in their view that TikTok provides them a unique and irreplaceable means to express themselves and form community. They bring this lawsuit to preserve their First Amendment rights and the rights of countless others, which are threatened by the Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50 (Apr. 24, 2024).

2.       The Act bans TikTok unless its owners divest the platform in a manner that is infeasible, as the company has stated and as the publicly available record confirms. The Act thus promises to shutter a discrete medium of communication that has become part of American life,[1] prohibiting Petitioners from creating and disseminating expressive material with their chosen editor and publisher—and from receiving such material from others.

3.      This extraordinary restraint on speech violates the First Amendment. In supporting the Act, lawmakers claimed that TikTok "manipulate[s]" American

---

[1] Sapna Maheshwari, *TikTok Has Changed America*, N.Y. Times (Apr. 19, 2024), https://tinyurl.com/3emzadbb.

minds[2] and disseminates "propaganda" that would "use our country's free marketplace to undermine our love for liberty."[3] But it is the Act that undermines the nation's founding principles and free marketplace of ideas. The First Amendment to our Constitution precludes Congress from censoring speech because of its content, viewpoints, editorial practices, or identity of speakers or publishers.

4.    To the extent the government may claim the Act's ban is necessary to protect Americans' data, it has tried that strategy before and lost. Two federal district courts have found that such concerns do not justify a ban. And rightly so. The concerns are speculative, and even if they were not, they could be addressed with legislation much more narrowly tailored to any purported concern.

5.    In sum, TikTok has a profound effect on American life. "Even if you've never opened the app, you've lived in a culture that exists downstream of what happens there."[4] Petitioners are part of this. They have found their voices, amassed significant audiences, made new friends, and encountered new and different ways of thinking—all because of TikTok's novel way of hosting, curating, and disseminating

---

[2] 170 Cong. Rec. H1163-71, H1169 (daily ed. Mar. 13, 2024) (statement of Rep. Dan Crenshaw), https://tinyurl.com/2aac7du4.

[3] Press Release, Rep. Mike Flood (NE), Congressman Flood Votes to Stop TikTok Propaganda (Mar. 13, 2024), https://tinyurl.com/tw8zdns5.

[4] Maheshwari, *supra* note 1; *see also* AJ Willingham et al., *The biggest ways TikTok has changed American culture*, CNN (Apr. 2, 2023), https://tinyurl.com/mrjxnu8d; Katerina Eva Matsa, *More Americans are getting news on TikTok, bucking the trend seen on most other social media sites*, Pew Rsch. Ctr. (Nov. 15, 2023), https://tinyurl.com/yc3eyfc4.

speech. The Act's ban of TikTok threatens to deprive them, and the rest of the country, of this distinctive means of expression and communication. Petitioners accordingly bring this action for declaratory and injunctive relief.

**PARTIES**

6. Petitioner Brian Firebaugh is a first-generation rancher in Hubbard, Texas. After serving in the U.S. Marine Corps, Firebaugh experienced homelessness and addiction but eventually obtained treatment and got a job working in a hospital. Over time, Firebaugh was able to save up enough to buy a small ranch. He uses TikTok to educate the public and his 430,000 TikTok followers about agricultural issues, feature his ranch products, and help the ranching community through charitable endeavors. Firebaugh earns income from the TikTok Creator Fund[5] and selling ranch products promoted on the app, which has allowed him to become a full-time rancher. His TikTok success also opened the door to his participation in a recent Netflix game show where his winnings enabled him and his wife to afford the adoption process for their son.

7. Without access to TikTok, Firebaugh would need to get a different job and pay for daycare instead of raising his son at home. In his words, "if you ban TikTok, you ban my way of life." Without TikTok, Firebaugh will also lose an

_____

[5] In 2020, TikTok launched a Creator Fund, which allows creators with a large following who consistently post content to receive awards from the TikTok Creator Fund. The Creator Fund has since evolved into the Creator Rewards Program.

important tool for helping his community and learning from and mentoring other ranchers. He has already started to see the effects of the Act, including a steep decline in new TikTok followers.

8.     Petitioner Chloe Joy Sexton lives in Memphis, Tennessee. After losing her job in 2020, Sexton started creating videos on TikTok while raising a newborn baby and caring for her mother who was battling brain cancer. When her mother passed, Sexton adopted her seven-year-old sister and continued to create videos about parenting, mental health, and her true love: baking. Eventually, Sexton's success on TikTok allowed her to fulfill her lifelong dream of opening a cookie company—which has thrived, largely due to the loyalty of Sexton's 2.2 million TikTok followers, who have witnessed her journey. Sexton now ships thousands of cookies every week all over the world and has published her own cookbook.

9.     Due to the Act, Sexton faces losing her vibrant community of TikTok followers who have consistently supported her throughout grief and the early days of parenthood, as well as celebrated her successes. Sexton would have to find another source of income and a different way of communicating to the public about her cookie company. TikTok's organic reach has allowed Sexton to connect with over two million people (who know and care about her content) for free—a powerful tool that traditional marketing cannot replicate.

10.     Petitioner Talia Cadet lives in Capitol Heights, Maryland. She uses

TikTok to share her book reviews and promote Black authors, as well as Black-owned businesses throughout the country, with her more than 126,000 followers. Through TikTok, Cadet has connected with book lovers all over the country and been invited to host in-person author events. She cherishes building community on the app by amplifying minority voices and helping others discover her favorite local, independent businesses. Cadet also uses the app to express her creativity and share entertaining content about her daily life. The Act threatens to deprive Cadet of access to this powerful community that has come to mean so much to her and would prevent her from using her voice to most effectively promote the people and businesses that she cares about.

11. Petitioner Timothy Martin coaches college football in Mayville, North Dakota. He creates content on TikTok to share his love and knowledge of sports with his approximately one million followers. Martin started posting videos on TikTok in 2020 while working as a student athlete. He uses it to stay connected with others in the sports community and maintain a strong sense of identity and positive mental health. He enjoys expressing himself creatively on the app, in particular by making his signature sports-commentary videos using the green-screen feature in CapCut—a ByteDance product for video editing. Martin generates revenue from his TikTok videos and promotes recognition for the small-town university where he coaches football. Martin fears the ban will deprive him, as well as other former athletes who

use TikTok, of a valuable interactive community. It also threatens his supplemental income.

12.    Petitioner Kiera Spann is a recent college graduate living in Charlotte, North Carolina. She started using TikTok in 2020 as a student to share information and ideas from her classes with the public. Today, Spann uses the app to advocate for the rights of sexual-assault survivors. She also educates her more than 760,000 TikTok followers about news, politics, and books. Spann partners with a variety of non-profits to spread awareness on TikTok about issues such as criminal justice reform and access to healthcare.

13.    Because of the Act, Spann will lose her ability to share information and perspectives with hundreds of thousands of people around the country and the world. Indeed, Spann chooses TikTok in part because she finds it to be the best platform for connecting with other sexual-assault survivors and promoting awareness of victims' rights. Spann is concerned that the Act will deprive her of access to a critical forum for connecting with the communities that she has carefully cultivated over the past few years.

14.    Petitioner Paul Tran lives in Atlanta, Georgia, where he and his wife founded a skincare line. After struggling to market their products through traditional advertising and other apps, the Trans found great success on TikTok, amassing 138,000 followers. The pair sell their line through TikTok Shop (TikTok's integrated

e-commerce solution that allows sellers to sell products directly on the platform). The couple's fame on TikTok has also led to life-changing opportunities, including appearances on television shows such as "Shark Tank" and "The Today Show." Without TikTok, such opportunities will disappear. Paul also uses TikTok to document memories with his young daughter, connect with other dads, follow martial arts, and research travel and restaurants.

15.    Petitioner Christopher Townsend lives with his family in Philadelphia, Mississippi. He served in the U.S. Air Force for six years as a cryptologic language analyst. Townsend is now a well-known hip hop artist and founded an organization dedicated to promoting biblical literacy by quizzing individuals on their knowledge of stories from the Bible. Townsend shares videos of these light-hearted and informative biblical quizzes with his 2.5 million TikTok followers. He also uses the app to share his music, which addresses topics such as his religion, patriotism, and political views. Because of the Act, Townsend faces losing the platform on which he is able to express his beliefs and share his spirituality and music with the world.

16.    Petitioner Steven King lives in Buckeye, Arizona. King has used TikTok since 2019 to create humorous content about his daily life and spread awareness about LGBTQ pride, self-confidence, and sober living. King also derives immense satisfaction and enjoyment from using his ingenuity to create content on the app for his 6.8 million followers—and seeing this content reach the kind of

audience that finds it most compelling. His content has deeply resonated with the public, some of whom ask King questions on TikTok about his experience coming out as gay in Arizona and his 28-year loving relationship with his husband. This community—which King has been unable to find on other social media and entertainment platforms—means the world to him.

17.     King's success on TikTok has opened up many opportunities for him, such as becoming a published author and being honored at the Cheer Choice Awards, which recognizes creators on social media who are making an impact using their platforms. Because of the Act, King is suddenly and unexpectedly facing the loss of his career and the irreplaceable community that he has worked hard to foster.

18.     Respondent Merrick B. Garland is the Attorney General of the United States of America. The Act directs the Attorney General to bring actions enforcing its prohibitions.

## JURISDICTION

19.     This Court has original jurisdiction over this matter under section 3(a)-(b) of the Act.

20.     This Court also has authority under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), to decide this action and award relief because the action presents an actual case or controversy within the Court's original jurisdiction.

# BACKGROUND

## A. TikTok Provides a Distinct Medium for Expression.

21. TikTok is a popular online platform that allows users to create, watch, share, and interact with short-form videos. TikTok's stated mission is to inspire creativity and bring joy.[6] More than one billion people around the world use TikTok each month, including approximately 170 million Americans.[7]

22. TikTok enables users to create, edit, and upload videos ranging from 15 seconds to 10 minutes in length. Users who create videos are called "creators," while the term "users" refers to both content creators and consumers. TikTok provides creators a palette of tools to amplify their expression, such as sounds, filters, and special effects.[8] Creators have control and creative license over their videos. TikTok users can like, comment on, and share creators' videos. The comment feature allows users to leave their impressions of or reactions to a TikTok video and facilitates conversation and community among users.

---

[6] TikTok, *Our Mission*, https://tinyurl.com/6neyxe2e.

[7] TikTok, *Thanks a billion!* (Sept. 27, 2021), https://tinyurl.com/mr2e2rmv; (@TikTokPolicy), X (Apr. 17, 2024, 6:56 PM), https://tinyurl.com/4v293w4k.

[8] Researchers have found that TikTok is "far more successful in converting content consumers into creators, in part because its creator tools are superior and more fun." Arvind Narayanan, *TikTok's Secret Sauce*, Knight First Amend. Inst. at Colum. Univ. (Dec. 15, 2022), https://tinyurl.com/44d4ejse; *see also* Werner Geyser, *What Is TikTok?—Everything You Need to Know in 2024*, Influencer Mktg. Hub (Jan. 30, 2024), https://tinyurl.com/5798vp2x (describing how TikTok's tools support "creative freedom"); Mia Sato, *TikTok's latest feature lets users make AR filters*, The Verge (Nov. 16, 2023), https://tinyurl.com/vkvdw3mc (describing TikTok's "filter templates" that allow users to "experiment with more than 2,000 assets to use in their effects").

23.     Although TikTok is sometimes compared to other social media platforms, it is different in important ways. TikTok does not require users to create personal profiles with information about their backgrounds, likes, interests, education, employment, and relationship status, or to "follow" or "friend" other users. Instead, TikTok's "For You" page provides curated videos for each user, without appending related user profile information or dates, making everything feel new and interesting. Unlike other platforms, TikTok allows users to explore new content and creators without personalizing their feeds themselves. "After years of irrelevant, disconnected news feeds, TikTok has revamped the scrolling experience, enabling discovery and curating interest-based entertainment."[9]

24.     These features are powered by the platform's distinct content recommendation system, which curates a unique and personalized compilation of videos for individual users based on judgments from how they interact with videos about what types of content are likely to be most interesting to them. The recommendation system amplifies creators' voices in different and distinct ways, providing them with an organic reach not just to more viewers but to specific viewers. This encourages creators to produce authentic expression and enables

_____

[9] AJ Kumar, *How TikTok Changed the Social Media Game With Its Unique Algorithm*, Entrepreneur (Aug. 16, 2022), https://tinyurl.com/2mks2euy; *see also* James Broughel, *TikTok Is A Beacon Of Democracy In The Social Media Landscape*, Forbes (Apr. 19, 2024), https://tinyurl.com/4ksur28w (describing how TikTok's algorithm "surface[s] content based on engagement with internet trends rather than metrics indirectly tied to follower count").

viewers to receive more engaging content.[10] By "learning users' interests and preferences in real time as they interact with content, it's not unusual for videos created by everyday people to suddenly get millions of views[.]"[11] In effect, TikTok creates a universe where everyday Americans from all walks of life can connect, communicate, and find their communities just by being themselves. Visibility on TikTok is not driven by someone's fame or fortune but by connections inspired by individual authentic expression.

25.    For example, in 2020, Firebaugh had only 5,000 followers and was struggling to maintain his ranch. One day, after being inspired by another TikTok creator to share his ranching experience, he created a video to dispel the myth that all Longhorn cattle are "vicious and dangerous," by showing him petting one of his friendly cattle. The video went viral and was viewed over 72,000 times, driving curious users to ask Firebaugh questions about agriculture and livestock and fueling interest in his way of life. This moment contributed to Firebaugh's rise as a content creator on TikTok, magnifying his ability to connect with others and receive life-

---

[10] *See* Narayanan, *supra* note 8 ("TikTok's algorithm treats each video more or less independently to assess its viral potential, caring relatively little about how many followers the creator has.").

[11] Willingham et al., *supra* note 4; *see also* Caroline Petrow-Cohen, *L.A. influencers, businesses live or die on TikTok's algorithm. Now they fear for the future*, L.A. Times (May 6, 2024), https://tinyurl.com/yv98bzxv (describing how TikTok supports creators and businesses without "a big production budget" and "bring[s] the viewers to them"); James Broughel, *TikTok Ban Lands a Blow to Intellectual Discourse Online*, Forbes (Apr. 30, 2024), https://tinyurl.com/3c5stmbt (TikTok's "algorithm has demonstrated a remarkable ability to elevate content from a wide range of users, regardless of their prior popularity or follower count.").

changing opportunities.

26.     Likewise, a few years ago, Spann posted a TikTok video of a protest regarding a domestic violence assault, which went viral and was viewed approximately nine million times. This video and the resulting media coverage—as well as Spann's continued advocacy—resulted in the perpetrator being held accountable and meaningful reforms in Spann's community.

27.     TikTok's content recommendation system also fosters communities and opens doors for connection. Creators post videos on myriad topics, including art, science, comedy, pets, cooking, music, travel and tourism, psychology, politics, and current events. Users can discover new interests. And users with niche interests can find other enthusiasts. Indeed, on TikTok, "[n]o interest is too small or obscure to coalesce into a community."[12] "Groups that specialize in, for instance, little-known cultural art forms or environmental conservation can reach new audiences, creating a mutually beneficial exchange" resulting in more awareness and more engaging content.[13]

28.     Spann and Cadet, for example, participate in BookTok, a large, well-known community of readers who share and engage with TikTok videos reviewing,

_____

[12] Willingham et al., *supra* note 4.

[13] *Id.*

recommending, and joking about the books they read.[14] Firebaugh has connected with other agricultural educators and cattle ranchers—a group that he described as insular. Firebaugh has called upon this community to help others in need. For example, he relied on TikTok to raise donations of badly needed cattle feed to send to the Texas panhandle after a recent series of devastating fires, and to alert the public about where to access his beef donations in cities around the state. Likewise, King has connected with other LGBTQ creators and audiences, as well as individuals living in or working through sobriety.

29.     TikTok has also emerged as a forum for political advocacy. Politicians from across the spectrum use the platform, especially to reach young people, activate new supporters, and break out as candidates. Even after passage of the Act, United States Senators continue to use TikTok to express their views and reach their constituents.[15] The campaign for President Biden also uses TikTok, a practice that Rob Flaherty, the campaign's deputy manager, defended when he stated on April 24, 2024, that it "would be silly to write off any place where people are getting information about the president."[16]

---

[14] Ryan Hudgins, *21 popular BookTok books and why they went viral*, Today (Mar. 15, 2023), https://tinyurl.com/kkvj3xur.

[15] *See, e.g.*, Sen. Ed Markey (@senmarkey), TikTok, https://tinyurl.com/msxmmv5c; Team Rosen (@rosenhq), TikTok, https://tinyurl.com/3kxcrtf8.

[16] Will Weissert, *Biden just signed a bill that could ban TikTok. His campaign plans to stay on the app anyway*, AP (Apr. 24, 2024), https://tinyurl.com/4n5y3546.

30.     Petitioners also use TikTok to engage in political speech. For example, Townsend has participated in TikTok's "Conservative Hype House," a collective of creators who discuss and debate views on current events from a conservative perspective and take turns posting videos to the collective's followers. Spann also uses TikTok to encourage Americans to engage in political and social advocacy.

31.     Additionally, Petitioners use TikTok for information about news and current events. For example, King views news from national and international journalists on TikTok. He finds TikTok to be one of the most unbiased and unfiltered news sources. Likewise, in Spann's experience, TikTok has a unique ability to spread time-sensitive and important news faster than any other platform—and she relies on it for such updates.

32.     TikTok also provides distinctive tools, such as sounds, filters, and special effects, to allow creators to post content that is not entirely replicable on other platforms. Content created on TikTok and CapCut may look and sound different than content created elsewhere. For example, TikTok allows users to quickly react to other videos through "duets," which allows creators to post their own videos alongside other TikTok videos; "stitches," which allows them to clip and integrate scenes from other TikTok videos into their own; and "remixes," which allow creators to "remix" different videos on TikTok. Many also use the app's "green screen" feature, in which their heads float over an image or a video in the

style of a news presenter, to offer criticism or commentary. Unlike other services where professional creators upload high-cost productions, TikTok creators can—and often do—become viral sensations with simple and spontaneous videos.[17]

33.    Firebaugh creates all his videos using TikTok because he finds the experience of creating videos through TikTok much easier than on other social media apps. Spann edits all her videos in TikTok or CapCut, finding other platforms inefficient. Likewise, Martin creates most of his videos using CapCut and relies heavily on the green-screen feature for his sports commentary videos. Without access to TikTok or CapCut, Martin would no longer be able to create his signature videos.

34.    These characteristics—intrinsic to the medium and derived from the system TikTok uses to curate content for each user—give TikTok a distinct culture and identity. Creating videos on TikTok ("TikToks") is thus its own form of expression, and content expressed through TikTok may convey a different meaning than content expressed elsewhere.

35.    Not only is TikTok a *medium* for expression, it is also a *forum* shaped by its editorial values. The platform compiles expression from millions around the

---

[17] *See, e.g.*, Frances Gurney, *This man has gone viral on TikTok for dancing to Nelly Furtado in front of his bathroom sink*, The Tab (Feb. 25, 2022), https://tinyurl.com/yc45ttt5; Jillian Giandurco, *Alex Consani Is TikTok's 2024 It Girl*, Bustle (Jan. 9, 2024), https://tinyurl.com/22j6bxyt.

world and curates the content through its recommendation system to create personalized compilations for each user. These compilations set TikTok apart from other platforms, which produce different compilations based on their own distinct editorial rules. Indeed, other social media platforms have attempted to recreate TikTok's "secret sauce" without the same success.[18]

36.    In fact, all of the Petitioners have tried using other social media apps, with far less success. For example, King has 6.8 million followers on TikTok, but only about 137,000 on Facebook. Sexton has 2.2 million followers on TikTok, but only about 44,000 on Instagram. Townsend has 2.5 million followers on TikTok, but only about 298,000 on Instagram. Firebaugh has more than 430,000 followers on TikTok, but only about 22,000 on Instagram. Martin has one million followers on TikTok, but only about 10,000 on Instagram. Spann has over 760,000 followers on TikTok, but less than 10,000 on Instagram. Tran's company has 138,000 followers on TikTok, but less than 2,000 followers on Facebook. And Cadet has 126,000 followers on TikTok, but less than 7,000 on Instagram.

37.    Sexton has compared TikTok with other social media apps by posting the same videos on multiple platforms. Her videos performed vastly better on

---

[18] Mia Sato, *YouTube is adding a slew of new TikTok-like features to Shorts*, The Verge (Aug. 1, 2023), https://tinyurl.com/y9ssbvz5; Conor Murray, *TikTok Clones: How Spotify, Instagram, Twitter And More Are Copying Features Like The 'For You' Page*, Forbes (Mar. 13, 2023), https://tinyurl.com/5yp2s4ej; Chris Stokel-Walker, *How TikTok beat Instagram*, Bus. Insider (Feb. 2, 2023), https://tinyurl.com/25eh5zpb.

TikTok. Sexton attributes these differences to the fact that TikTok's algorithm, in her experience, gets her videos in front of the exact communities who find it most compelling—in her case, mostly mothers and fellow baking aficionados. Martin has experienced the same results—unlike other social media apps, TikTok conveys his content directly to sports lovers who are most likely to enjoy it.

38.     TikTok's defining traits stem from the editorial decisions it makes using its proprietary content recommendation technology. "TikTok would no longer be TikTok" without that technology.[19] Petitioners have personally experienced ownership and editorial changes that alter expression on other social media platforms, while also affecting the types of expression those platforms published and promoted.[20] For example, King and Spann no longer regularly post content on X after Elon Musk's acquisition of Twitter. Spann worries that, if forced to divest, TikTok's new owner may follow other social media companies and, for example, allow paid political advertising on the app, which fundamentally changes the user experience.

---

[19] Daniel E. Sanger, *TikTok Has Changed America*, N.Y. Times (Apr. 19, 2024), https://tinyurl.com/3emzadbb.

[20] Steven Lee Myers, et al., *The Consequences of Elon Musk's Ownership of X*, N.Y. Times (Oct. 28, 2023), https://tinyurl.com/3bstx77m ("the site has experienced a surge in racist, antisemitic and other hateful speech"); Bobby Allyn, *Why can't Twitter and TikTok be easily replaced? Something called 'network effects'*, NPR (Apr. 12, 2023), https://tinyurl.com/ymeummzv ("Since Elon Musk acquired the platform in October, [one user] has noticed his Twitter feed devolve into an engine of self-promotion for the billionaire's constantly shifting whims.").

39.     Petitioners thus have an interest not only in creating and accessing expression through TikTok, but an interest in creating and accessing expression as curated using TikTok's current editorial practices.

**B.     Courts Block Attempts to Ban TikTok.**

40.     TikTok has for years drawn regulatory scrutiny.[21] This scrutiny has focused on unproven data security claims stemming from the allegation that TikTok is a company whose ultimate parent is allegedly headquartered in China, as well as concerns about TikTok's resulting editorial choices, content, and viewpoints.[22] Federal courts have blocked every attempt to ban TikTok, including on the basis of unproven data security concerns.

41.     In *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73 (D.D.C. 2020), the U.S. District Court for the District of Columbia held that the President lacked authority to issue an executive order intended to stop U.S. users from communicating on TikTok, even where the order's purported ultimate purpose was to protect national security by preventing China from accessing data. *Id.* at 83. While the court found ample evidence that China *generally* poses a credible national security threat, it found no "specific evidence" of a threat stemming from TikTok, much less that a

---

[21] *See, e.g.*, John D. McKinnon, *U.S. Threatens Ban if TikTok's Chinese Owners Don't Sell Stakes*, WSJ (Mar. 15, 2023), https://tinyurl.com/yxuus85z.

[22] *Id.*

ban was the "only effective way to address that threat." *Id.* at 85. The court later affirmed that conclusion as applied to additional Commerce Department regulations, enjoining the Secretary's action and again finding a lack of evidence that TikTok posed a national security threat. *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 114–15 (D.D.C. 2020)

42. Similarly, in *Marland v. Trump*, 498 F. Supp. 3d 624 (E.D. Pa. 2020), the U.S. District Court for the Eastern District of Pennsylvania enjoined the same executive order and related agency action. Rejecting the government's national security concerns as "hypothetical," the court concluded the public interest in an injunction outweighed the speculative risk the Government presented. *Id.* at 642–43.

43. Most recently, in *Alario v. Knudsen*, -- F. Supp. 3d --, 2023 WL 8270811, at *8 (D. Mont. Nov. 30, 2023), the U.S. District Court for the District of Montana enjoined a law banning TikTok in Montana, holding the ban likely violated the company's and users' First Amendment rights and finding the state's claim that Chinese officials could "gain access to Montanans' data without their consent" unsupported by evidence. *Id.* at *13.

44. In response to concerns raised by the government, TikTok has announced numerous measures to safeguard U.S. user data and protect the U.S. TikTok platform against foreign government influence. TikTok reports that it has voluntarily invested more than $2 billion to build a system of technological and

governance protections, sometimes referred to as "Project Texas." TikTok has also reported making additional commitments in a proposed National Security Agreement developed through negotiations with the Committee on Foreign Investment in the United States (CFIUS), including agreeing to a "shut-down option" that would give the government authority to suspend TikTok in the United States if the company were found to violate certain agreed-upon obligations.

## C. Congress Bans TikTok Unless the Company Finds, and the President Approves, a New Publisher.

45. Undeterred, Congress has now banned TikTok in the United States, effective January 19, 2025. President Biden signed the Act on April 24, 2024.

46. The content-based, viewpoint-based, and speaker-based aims of the Act are no secret. In supporting the Act, Representative Crenshaw (TX) claimed TikTok "manipulate[s] the minds of Americans."[23] Representative Smith (N.J.) described the Act as "countering [Chinese] efforts to sway [American] public opinion in its favor[.]"[24] Representative Flood (NE) claimed TikTok disseminates "propaganda" that would "use our country's free marketplace to undermine our love for liberty."[25] Representative Fulcher (ID) claimed TikTok gives China "the ability to engage in

---

[23] 170 Cong. Rec. at H1169.

[24] *Id.*

[25] Flood, *supra* note 3.

psychological warfare against the American people."[26] Representative Strong (AL) asserted that TikTok "set[s] an anti-American narrative in the United States," pushes "propaganda videos from Osama bin Laden," and promotes "an anti-Israel message[.]"[27] One of the bill's co-sponsors, Representative Krishnamoorthi (IL), claimed that "the CCP has ultimate control of the algorithm which feeds the content of the platform."[28] And in an interview with Secretary of State Antony Blinken, Senator Mitt Romney (UT) explained that the Act enjoyed "overwhelming support" in Congress precisely because of members' perceptions about the subject matter and viewpoints discussed on the platform, such as "the number of mentions of Palestinians relative to other social media" on "TikTok broadcasts."[29]

47.    These arguments focus on censoring TikTok's content recommendation system. Without any evidence, certain Congressmembers created a fiction that TikTok curates content to push propaganda[30] and "drive certain

---

[26] Press Release, Rep. Russ Fulcher (ID), Congressman Russ Fulcher's Statement on the Passage of H.R. 7521 (Mar. 14, 2024), https://tinyurl.com/mwaunwda.

[27] Press Release, Rep. Dale Strong (AL), Strong Statement on Curtailing CCP Surveillance on American Citizens (Mar. 13, 2024), https://tinyurl.com/bddv4s89.

[28] Rep. Raja Krishnamoorthi (IL), (@congressmanraja), Instagram (Apr. 25, 2024), https://tinyurl.com/ycxw6xpf.

[29] Press Release, Sec'y of State, Antony J. Blinken, Secretary Antony J. Blinken At McCain Institute's 2024 Sedona Forum Keynote Conversation with Senator Mitt Romney (May 3, 2024), https://tinyurl.com/57zafh8j.

[30] Press Release, Rep. Jack Bergman (MI), Bergman Supports Bipartisan Legislation to Stop Foreign Adversaries from Owning Social Medial Companies (Mar. 13, 2024), https://tinyurl.com/23j8st77.

messages to divide Americans, to destabilize our politics, to influence policymakers to denigrate policymakers, [and] to tear our country apart."[31] Representative Gallagher (WI)—who co-authored an earlier version of the Act—urged colleagues to support the Act precisely because TikTok had become a "dominant news platform" to which young Americans increasingly turn for news and information.[32] Because the same could be said of other social media, Congress's decision to focus on TikTok demonstrates animus toward the speech TikTok publishes and the speakers who publish it.

48. Congressmembers' concerns with content on TikTok extend beyond alleged foreign propaganda. Senator Warner (VA) lauded the bill for arresting what he called TikTok's "enormous power to influence and divide Americans."[33] Representative Clarke (NY) claimed the Act is necessary to force TikTok "to become an American company guided by American principles and Western democratic values,"[34] and Representative Huffman (CA) expressed concern about

---

[31] Scott Wong et al., *It could be months before the Senate takes up a TikTok bill, despite warnings about China*, NBC News (Mar. 20, 2024), https://tinyurl.com/njsz2zar.

[32] 170 Cong. Rec. at H1165.

[33] Press Release, Sen. Mark R. Warner (VA), Warner, Rubio Applaud House Passage of Bill to Protect Americans from Foreign Adversary Controlled Applications Including TikTok (Mar. 13, 2024), https://tinyurl.com/3v9p7zxn.

[34] Press Release, Rep. Yvette D. Clarke (NY), Rep. Clarke Releases Statement on H.R. 7521, The Protecting Americans from Foreign Adversary Controlled Applications Act (Mar. 7, 2024), https://tinyurl.com/393xz8zb.

the use of TikTok to wield "significant influence over tens of millions of Americans," through "malign disinformation campaigns."[35] Senator Cantwell (WA), who chairs the Senate subcommittee for technology, was even more explicit, suggesting the Act will allow the federal government to "stop bad actors from broadcasting … into the United States with nefarious messages[.]"[36]

49.     The Act bans a "foreign adversary controlled application" from operating (i.e., publishing) within the territorial borders of the United States. *See* Act § 2(a)(1)(A)-(B). The statute then makes clear (if it was not already clear) that it targets one particular company: TikTok. It expressly defines "foreign adversary controlled application" to include any application operated by TikTok or its ultimate parent, ByteDance Ltd. *Id.* § 2(g)(3)(A)(i)-(iii).

50.     The Act also makes clear its focus is the speech TikTok publishes. While the Act singles out TikTok, it establishes a more general category of "covered compan[ies]" to which it can theoretically apply. *Id.* § 2(g)(2)(A). Even for such companies, the Act applies only to entities that operate an application with more than one million monthly active users during a specified time period that enables those

---

[35] Press Release, Rep. Jared Huffman (CA), Huffman Statement On Vote For The Protecting Americans From Foreign Adversary Controlled Applications Act (Mar. 12, 2024), https://tinyurl.com/mtrbmmze.

[36] Natalie Andrews, *Powerful Senator Crafts TikTok Crackdown*, WSJ (Apr. 14, 2024), https://tinyurl.com/kpdsyatm.

users to "generate, share, and view text, images, videos, real-time communications, or similar content." *Id.* And the Act expressly excludes from that catchall definition of "covered company" any companies that offer any service "whose primary purpose is to allow users to post product reviews, business reviews, or travel information and reviews." *Id.* § 2(g)(2)(B).

51.    The Act contains a so-called "qualified divestiture" regime that underscores its purpose and effect is to ban TikTok. *Id.* § 2(g)(6). The Act provides that TikTok may theoretically continue publishing in the United States if sold within 270 days to another approved entity. *Id.* § 2(a)(1)(A), § (2)(a)(2)(A), § (2)(g)(6). The President possesses discretion to withhold pre-approval, as the Act ultimately leaves it to his judgment—following an unspecified "interagency process"—whether to approve the divestiture. *Id.* § (2)(g)(6)(B). But to the extent the Act includes standards to guide the President's discretion, they make clear the Act effectuates a ban. Specifically, the Act requires the President to ensure that any divested successor is not permitted to maintain "any operational relationship" between its U.S. operations and any "formerly affiliated entities that are controlled by a foreign adversary," including any "cooperation with respect to the operation of a content recommendation algorithm." *Id.* TikTok states this is not a viable option. *See* Pet. for Review ¶¶ 25-29, *TikTok Inc. v. Garland*, No. 24-1113 (D.C. Cir. May 7, 2024).

Publicly available information reinforces that conclusion.[37]

52.     The Act subjects any entity that provides access to TikTok in violation of this ban to a penalty of $5,000 for each user who access the platform "multipl[ied] … by the number of users within the land or maritime borders of the United States" who access, maintain, or update the app as a result of the violation. *Id.* § 2(d)(1)(A). Because TikTok currently has approximately 170 million users in the United States, the fine for continuing to enable access to TikTok would be roughly $850 billion.

## LEGAL PRINCIPLES

53.     Only certain strictly limited categories of speech fall outside the First Amendment's protection—defamation, fraud, incitement, true threats, obscenity, and speech integral to criminal conduct—and the Supreme Court has repeatedly rejected attempts to expand these categories. *United States v. Stevens*, 559 U.S. 460, 468-69 (2010). The First Amendment protects Americans' rights to distribute and receive all other information, including from overseas. *See, e.g.*, *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *Lamont v. Postmaster Gen.*, 381 U.S. 301, 307 (1965).

54.     Prior restraints—that is, restraints on speech before it is published—are the most serious and the least tolerable infringement on First Amendment rights. *Neb. Press Ass'n v. Stuart,* 427 U.S. 539, 559 (1976). Any law that imposes a prior

---

[37] Laura He, *Banning TikTok would hit China's tech ambitions and deepen the global digital divide*, CNN (Apr. 24, 2024), https://tinyurl.com/bdp8mk74.

restraint on expression thus carries "a heavy presumption against its constitutional validity," *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963), even where the restraint is allegedly necessary for national security, *N.Y. Times Co. v. United States,* 403 U.S. 713, 714 (1971).

55. Content-based, viewpoint-based, and speaker-based laws that restrict or burden speech are also presumptively unconstitutional. The "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790–91 (2011) (citation omitted). Nor may the government discriminate among speakers, particularly where such restrictions "reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994). Finally, the Government may not require speakers to use editors or publishers different from those with whom the speakers wish to associate and work. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569–70 (1995).

56. Any law that restricts speech along any of these lines is subject to strict or an even higher form of scrutiny, requiring, at a minimum, that the government establish that its regulation furthers a compelling interest and uses the least restrictive means to achieve it. *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000).

57. Even intermediate scrutiny—which applies where laws restrict merely the time, place, or manner of speech—requires the government to prove its restriction (1) will serve a substantial government interest "unrelated to the suppression of free expression" by alleviating in a direct and material way harms that are "not merely conjectural," and (2) is narrowly tailored to suppress no more speech "than is essential to the furtherance of that interest." *Turner*, 512 U.S. at 662, 664 (citations omitted).

58. The Constitution also "gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002). Even if a law has some legitimate applications, it still is unconstitutional if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473 (citation omitted). Laws categorically banning protected speech are thus virtually always invalid because they are overbroad. *See Bd. of Airport Commr's of City of L.A. v. Jews for Jesus*, 482 U.S. 569, 574–75 (1987).

## CLAIM ONE

## VIOLATION OF THE FIRST AMENDMENT TO THE U.S. CONSTITUTION

59. Petitioners incorporate all prior allegations above as if fully set forth herein.

60.     The Act regulates "speech" under the First Amendment by singling out and effectively banning a medium of communication—TikTok—that Petitioners (and other Americans) use to engage in protected expression, prohibiting them from sending and receiving information they are entitled to communicate.

61.     The Act erects an unconstitutional prior restraint by banning protected speech on TikTok and by empowering the President to pre-approve who may publish and edit TikTok's service and, in turn, the speech Petitioners wish to disseminate on that platform.

62.     The Act regulates on a content-, speaker-, and viewpoint-basis. The law is content- and speaker-based because it expressly bans TikTok but exempts other companies based on the type of content those companies' apps publish. The law is also content-, speaker-, and viewpoint-based because it prohibits operation of TikTok's current content recommendation system by its current editors, preventing Petitioners from using their chosen editor and publisher to engage in protected communication. From the standpoint of the First Amendment, this restriction is no different from prohibiting American freelance writers from submitting articles to The Economist, or American musicians from disseminating songs through Spotify. The Act further regulates speech based on its viewpoint because it is motivated by a disfavored view of the ideas that are, or could be, expressed or promoted on TikTok.

63.     The Act for all these reasons bears a heavy presumption of

unconstitutionality—more stringent than even strict scrutiny—and fails even intermediate scrutiny. The government cannot ban a medium for communication because it believes that medium is used to transmit foreign "propaganda" or other protected content. Nor does the government have any actual, non-speculative evidence that banning TikTok in its current form enhances Americans' data security, or that its ban is narrowly tailored to accomplish that objective. The fact that the Act is paired with other federal legislation restricting how data brokers may share and sell American user information to certain foreign entities underscores that the ban is not narrowly tailored.

64.     The government has not identified any other basis to justify its ban, nor is there any conceivable legitimate interest that would warrant shuttering an entire media platform used by millions that could not be achieved through narrower regulation.

65.     The Act is unconstitutionally overbroad because it bans an entire medium of communication and all the speech communicated through that medium, even though, at the very least, the vast majority of that speech is protected and not otherwise subject to suppression.

66.     Unless declared invalid and enjoined, the Act will unlawfully deprive Petitioners of their rights under the First Amendment, inflicting immediate and irreparable harm.

## PRAYER FOR RELIEF

WHEREFORE, Petitioners respectfully pray for judgment:

a. Granting this Petition for Review;

b. Declaring the Act invalid under the United States Constitution because it violates Petitioners' First Amendment rights;

c. Enjoining Respondent from taking any action to enforce the Act;

d. Entering judgment in favor of Petitioners; and

e. Awarding Petitioners all other such relief as the Court deems just and proper.

Dated: May 14, 2024

DAVIS WRIGHT TREMAINE LLP

By: /s/ *Ambika Kumar*
Ambika Kumar

Ambika Kumar
Tim Cunningham
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104
(206) 757-8030
ambikakumar@dwt.com
timcunningham@dwt.com

Elizabeth A. McNamara
Chelsea T. Kelly
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas
New York, New York 10020

Jeffrey L. Fisher
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, California 94025
(650) 473-2633
jlfisher@omm.com

(212) 489-8230
lizmcnamara@dwt.com
chelseakelly@dwt.com

James R. Sigel
Adam S. Sieff
DAVIS WRIGHT TREMAINE LLP
50 California Street, Suite 2300
San Francisco, California 94111
(415) 276-6500
jamessigel@dwt.com
adamsieff@dwt.com

*Attorneys for Petitioners*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of May, 2024, I caused copies of the foregoing Petition for Review and Complaint for Declaratory and Injunctive Relief to be served upon the following recipients.

By certified mail, postage prepaid:

        Merrick B. Garland
        Attorney General of the United States
        U.S. Department of Justice
        950 Pennsylvania Avenue, NW
        Washington, DC 20530

By hand delivery:

        Matthew M. Graves
        United States Attorney
        601 D Street, NW
        Washington, DC 20579

*/s/ Ambika Kumar*
Ambika Kumar

*Counsel for Petitioners*